

528-09/WLJ
FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff
SAN JUAN NAVIGATION CORP.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
William L. Juska, Jr.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

SAN JUAN NAVIGATION CORP.,

                                    Plaintiff,

        - against –

INTERNATIONAL MATERIALS INC.,

                                    Defendant.

------------------------------------------------------------x

09-CV-

**VERIFIED COMPLAINT**

        Plaintiff, SAN JUAN NAVIGATION CORP. (hereinafter "Plaintiff" and/or "San Juan"),

by its attorneys Freehill, Hogan & Mahar, LLP, as and for its Verified Complaint against the

Defendant INTERNATIONAL MATERIALS INC. (hereinafter "IMI), alleges upon

information and belief as follows:

        1.   This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract

of charter party. This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333, and the Court's federal question jurisdiction pursuant to 28 U.S.C.

§1331. Federal jurisdiction also exists because the action arises under the New York Convention

on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.    At all times relevant hereto, the Plaintiff San Juan was and still is a foreign business entity duly organized and existing under the laws of the Republic of the Marshall Islands with an office and place of business in care of San Juan Navigation LLC (hereinafter "SJN LLC") at 900 Winslow Way East, Suite 220, Bainbridge, Washington 98110. Plaintiff San Juan and SJN LLC are related entities.

3.    At all times relevant hereto, the Defendant IMI was and still is a business entity duly organized and existing under the laws of one of the states of the United States with an office and place of business at 993 Old Eagle School Road, Suite 416, Wayne, Pennsylvania 19087.

4.    On or about October 19, 2004, Plaintiff San Juan entered into a maritime contract of voyage charter party on an amended Genvoy 1977 form with Defendant IMI by which San Juan agreed to charter to IMI a vessel "to be nominated" for the carriage of cement clinker in bulk from "one safe berth Conchan" in Peru to one safe berth or anchorage in the Mississippi River. A copy of the subject voyage charter party is annexed hereto as Exhibit A (hereinafter the "voyage charter party").

5.    Under a time charter dated June 12, 2003 Plaintiff San Juan's related entity, SJN LLC, had chartered the vessel M/V GEORGETE K from the owners of that vessel, Santos Maritime S.A. (hereinafter "Head Owners") for a period of 11 to 13 months, with an option to extend the charter for an additional 11 to 13 months. On February 10, 2004 SJN LLC exercised its option to extend the time charter. A copy of the subject time charter party is annexed hereto as Exhibit B (hereinafter the "time charter party").

6.    Plaintiff San Juan is the assignee of all the rights and obligations of SJN LLC under the time charter party.

7.    Plaintiff San Juan nominated the M/V GEORGETE K to perform under the voyage charter party with Defendant IMI.

8.    The time charter party provided, *inter alia*, that the SJN LLC would trade the vessel "via safe port(s), safe berths, safe anchorage(s), always afloat, always accessible", and further provided that the any dispute arising between the Head Owners and SJN LLC would be subject to arbitration in London. (See. Ex. B hereto, at lines 14-15 and ¶1 17, respectively).

9.    The voyage charter party between Plaintiff San Juan and Defendant IMI similarly provided, *inter alia*, as follows:

"Loading Port:

    1.    That the said vessel being tight, staunch and in every way fit to carry the cargo shall proceed to one safe berth Conchan where 11 meters salt water and lie safely afloat. [lines 10 -13]

"Loading and Discharge Berth:

    11.    The cargo to be loaded and/or discharged at any wharf dock or place that the Charterers or their agents may direct, provided the vessel lie always safely afloat." [lines 77-78]

10.    The incorporation of a safe berth and safe port clause, as outlined in paragraphs 8 and 9 above, constitutes a warranty under English law that the port(s) to which the charterer trades the vessel shall be ones which the vessel can reach, use and return from without, in the absence of some abnormal occurrence, being exposed to danger.

11.  Between May 27-30, 2005, while the M/V GEORGETE K was loading Defendant IMI's cargo of cement clinker pursuant to the voyage charter party, the vessel suffered structural damage to her port side in way of the no. 2 and no. 5 hold, while moored alongside the pier at Conchan, Peru.

12.  During loading operations at Conchan from May 27 to 30, 2005, the Master of the vessel sent messages to Plaintiff San Juan at 0755 hours on May 29 protesting the conditions at the berth, noting that due to heavy swells, the vessel was "rolling and slamming", three shore lines and one ship's line had parted and the vessel needed to be moved to anchorage before it began striking the pier. At about 2121 hours on the same date, the Master sent another message to San Juan protesting that the swells had increased to 3.5 meters, causing the vessel to range 10-15 meters forward and aft and up to 10 meters from the pier, that the main deck and accommodation were covered in cement dust and that the vessel's "line to the sea" had parted, as had her stern line.

13.  Prior to loading operation at Conchan on May 27, 2005 the vessel's crew entered and cleaned the holds following completion of the discharge of a prior coal cargo. There was no damage to the portside plating or framing in holds nos. 2 and 5 noted during that cleaning.

14.  Prior to loading, between 0645 hours and 0730 hours on May 27, 2005, surveyors appointed by Defendant IMI's shippers, Baltic Control, inspected all the vessel's holds and passed them as fit to carry the cargo of cement clinker. No damage to the portside plating and frames in holds nos. 2 and 5 was noted by the surveyors.

15. After discharge of the cement clinker cargo, the Head Owner's surveyors, Maritech Commercial Inc., surveyed the vessel's holds and found peeling paint as well as heavily buckled and distorted flanges, brackets and shell plating in holds nos. 2 and 5.

16. After redelivery of the M/V GEORGETE K from the time charter party, the Head Owners repaired the damages to the vessel at Shanghai between August 14-31, 2005.

17. The Head Owners commenced London arbitration against SJN LLC to recover for the damages to the vessel and in January-February 2007 a Tribunal was formed, with Mr. Lindsay Gordon appointed as the arbitrator for SJN LLC and Mr. Michael Baker-Haber appointed by Head Owners.

18. In the London arbitration against SJN LLC the Head Owners have claimed: (a) $295,136.44 for the cost of, and expenses related to, the repairs to the vessel and (b) $212,500 for the loss of use of the vessel during the 17 day period of repairs, based on the market rate of $12,500 per day which Head Owners would have earned had the vessel been available for charter during the period of repairs.

19. The Head Owners have also claimed compound interest pursuant to Section 49 of the English Arbitration Act 1996 on all amounts which may be found due them.

20. SJN LLC has provided security to the Head Owners in the form of an underwriter's Letter of Undertaking in the amount of $850,000. approximately $71,500 of which relates to another item of damage to the vessel unrelated to this action.

21. Plaintiff San Juan has been damaged by Defendant IMI's breach of the safe port/berth warranty of the voyage charter party, as set forth in lines 10-13 and lines 77-78. See Exhibit A hereto.

22. Plaintiff San Juan has commenced London arbitration against Defendant IMI under the voyage charter party. The Tribunal was formed in January-February 2007 with Mr. Michael Baker-Haber appointed as the arbitrator for San Juan and Mr. Mark Hamsher appointed by Defendant IMI.

23. As a consequence of the foregoing, Plaintiff San Juan has a claim against Defendant IMI for breach of the voyage charter party in failing to nominate a safe berth, and has or will suffer damages consisting of:

(i) the cost of, and expenses related to, the repair of the vessel in the amount of **$295,136.44;**

(ii) **$212,500** for the loss of use of the vessel during the 17 day period of repairs;

(iii) **$211,172.85** in interest, calculated at 5%, compounded quarterly, from the date of repairs, August 31, 2005, until August 2012, the estimated date of completion of the arbitration.

(iv) £35,000 for the arbitrators' fees in the arbitration between the Head Owners and SJN LLC and £150,000, as best as can be estimated for the Head Owners' legal fees in that arbitration, which are recoverable as part of the Head Owners' claims under English law, for a total of **$302,805.70,**

(v) £70,000 (**$114,607.33**), as best as can be determined, for the legal fees incurred and to be incurred by SJN LLC in defending the claims brought by the Head Owners.

24. As stated above, the voyage charter party between Plaintiff San Juan and Defendant IMI provides that all disputes between the parties are to be resolved by arbitration in London, and Plaintiff San Juan specifically reserves its right to continue to arbitrate the substantive matters at issue.

25. This action is brought in aid of the London arbitration against Defendant IMI to obtain security for the claims and for the additional sums which Plaintiff will incur in the way of anticipated attorney fees and arbitral costs in the arbitration, all of which are recoverable as part of Plaintiff's claim under English law, and which are estimated, as nearly as can be computed, at £35,500 ($49,906.14).

26. Plaintiff San Juan has satisfied all of its obligations under the Charter Party with IMI

27. The total amount for which Plaintiff San Juan seeks security in this action is $1,186,128.44, no part of which has been paid by Defendant IMI.

**Request for Rule B Relief**

28. Plaintiff San Juan has periodically chartered vessels to Defendant IMI over the years and payment of freight has always been denominated in U.S. dollars.

29. In the voyage charter party between Plaintiff San Juan and Defendant IMI the payment of freight is denominated in U.S. dollars at $19.75 per metric ton. See Exhibit A hereto, ¶ 2, line 23.

30. On their website (http://ww.imius.com) defendant IMI states that it has marketed over 3,500,000 metric tons per year of natural and synthetic gypsum, cement, clinker and other products and that it charters over 80 vessels per year.

31. One of Defendant IMI's self-described trading "partners", Diproinduca, describes IMI on its website (http://diproinduca.com/partners/imternational-mateiral.php) as follows:

> "IMI was founded in 1987 and is a privately owned company specialized in the shipping, handling and marketing of gypsum and cement products, as well as a variety of other building and industrial related bulk materials. IMI charters over 80 vessels per year from 2,000 tons to Panamax size and operates primarily self loading and self discharging vessels to ensure the most cost effective loading / discharge of cargoes."

32. Since most vessel charters call for the payments of freight or hire in U.S. dollar denominations, and since IMI is reported to be actively chartering vessels, it is likely that IMI will soon be engaged in financial transactions making payments to vessel owners by U.S. dollar denominated electronic funds transfers. Furthermore, Defendant IMI is a U.S. corporation transacting business out of Pennsylvania.

35. Upon information and belief, U.S. Dollar payments made in international commercial transactions of the type entered by Defendant IMI are frequently made by electronic funds transfers. Approximately 95% of all electronic funds transfers in U.S. dollars between foreign entities are processed through the Clearing House Interbank Payments System ("CHIPS"). In order to convert a foreign currency into U.S. dollars, payments are routed through a participating CHIPS bank, usually located in New York City.

36. Upon information and belief, because Defendant IMI is, and will continue to be during the pendency of this litigation, engaged in international maritime commerce, it will be making or receiving some payments in U.S dollars, and some of those payments will be in the form of electronic funds transfers through a CHIPS bank, usually located in New York City, within this District.

37... Electronic funds transfers to or from a party in the hands of an intermediary bank have been held to be an attachable asset of that party and can be restrained pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F3d 434, 436 (2d Cir, 2006).

38. Accordingly, upon information and belief, Defendant IMI has or will have during the pendency of this litigation assets in the District in the form of electronic funds transfers at banks located in New York City, including but not limited to "ASSETS" at, being transferred through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

**WHEREFORE**, Plaintiff prays:

a.      That process in due form of law according to the practice of this Court issue against the Defendant, citing Defendant to appear and answer under oath all and singular the matters alleged, failing which a default will be taken against it in the principal amount of **$507,636.44**, plus interest, costs and attorneys fees;

b.      That since Defendant cannot be found within this District pursuant to Supplemental Rule B, all tangible or intangible property of the Defendant, up to and including the sum of **$1,186,128.44**, be restrained and attached, including but not limited to any cash, funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or any other property of, belonging to, due to, from, or for the benefit of Defendant (collectively "ASSETS"), including but not limited to such "ASSETS" as may be held, received or transferred in its own name or as may be held,

received or transferred for their benefit at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein; and

c. That since it appears that the U.S. Marshal's Service lacks sufficient staff to effect service of process of Process of Maritime Attachment and Garnishment promptly or economically to permit the attachment of electronic fund transfers, and that since appointing a person over 18 years of age and who is not a party to this action will result in substantial economies in time and expense, such a person be appointed pursuant to Fed.R.Civ.P. 4(c) to serve process of maritime attachment and garnishment in this action.

d. That this Court retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary; and,

e. For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
August , 2009

> FREEHILL HOGAN & MAHAR, LLP
> Attorneys for Plaintiff
> SAN JUAN NAVIGATION CORP.

By: _____
William L. Juska, Jr.
80 Pine Street
New York, NY 10005
(212) 425-1900/ fax (212) 425-1901

### ATTORNEY VERIFICATION

State of New York    )
                     ) ss.:
County of New York   )

WILLIAM L. JUSKA, JR., being duly sworn, deposes and says as follows:

1.    I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.    The sources of my information and the grounds for my belief are communications, information and documentation provided by our clients.

3.    The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
William L. Juska, Jr.

Sworn to before me this
18 day of August, 2009

_____
Notary Public

CLARE HENRY
Notary Public, State of New York
No. 01HE4831495
Qualified in Kings County
Certificate in New York County
Commission Expires October 31, 2009



Exhibit A

Dec 30 2004 12:31    International Materials I    610-520-1982    p.2

Adopted Oct. 1, 1969
Revised Sept. 1, 1971
Revised March 1, 1977

*International Materials, Inc.*

660 COUNTY LINE ROAD
BRYN MAWR, PA 19010
U.S.A.

TELEPHONE: 610-520-1980
FACSIMILE: 610-520-1982
E-MAIL : IMI@iml-mat-inc.com

# GENVOY
## GENERAL PURPOSE VOYAGE CHARTER PARTY

Bryn Mawr, PA 19 October 2004

**Owners:** It is this Day mutually agreed between San Jaun Navigation Corporation of the Marshall Islands 2
**Vessel:** Owners of the _____ gross _____ tons register, classed _____ same . See Clause 39 . 3
of _____ net _____ tons register, classed _____ 4
**Position:** now _____ and expected ready to load under this charter on or about _____ 5
**Charterers:** _____ and International Materials, Inc of _____ 6
Pennsylvania _____ as Charterers: 7
Unless otherwise specified, whenever the terms "ton" or "tons" appears in this Charter Party, it is deemed to mean a 8
metric ton of 1,000 Kilos. 9

**Loading Port:** 1. That the said vessel being tight, staunch, strong and in every way fit to carry the cargo shall proceed to 10.
one safe berth Chirhan where 1f meters salt water. 11
_____ 12
**Cargo:** as it has direct at the wharf to be cut and in always afloat (except as per Clause No. 11) and there load a full perm- 13
cargo in bulk under Charterers option at 31,500 mt minimum . option at 34,100 mt maximum 14
cement clinker in bulk . Optional cargo to be declared by ICR NT 20 February 2005 . 15
In the event that SJN cannot find a ship to lift the contractual quantity IMI will agreed 16
to take a smaller vessel. It is understood that if IMI sells the optional cargo that same will be 17
**Destination:** which the Charterers bind themselves to ship, and being so loaded, the vessel shall proceed to _____ carried by 18
one safe berth or one safe anchorage Mississippi River . SJN 19
_____ 20
_____ 21
as ordered on signing Bills of Lading, or to one though as she may safely get and lie always afloat (except as per Clause 22
No. 11), and there deliver the cargo.

**Rate and Payment** 2. Freight shall be paid on intaken/outturn weight as follows: US$ 19.75 per metric ton free . 23
**of Freight:** in/out trimmed basis 1/1 24
| Ninety-five | Intaken . . named Freight payable as per C/P/ _____ three loading . . unloading . . 25
_____ percent of the freight on full of lading weight to be prepaid in New York within five days of signing and lading, 27
freight in New York, or as otherwise specified, or Bills of Lading to Charterers or the Charterers' agents. The balance of freight 28
to be paid in New York following completion of discharge of the cargo and to include settlement of dead freight, demurrage 29
or despatch, and adjustment according to outturn weight unless freight is payable on intaken weight. Full freight to be 30
deemed earned and cargo is loaded on board the vessel, and non-returnable, vessel and/or cargo lost or | 31 |
not lost, Charterers are entitled to deduct from the freight all brokerage, also despatch money at loading and discharging 32
port(s) if any. Within 14 days after the Owners present the final account which to be | 33 |
| mailed/faxed directly to charterers | 34 |

**Laydays and** 3. Laydays are not to commence before _____ See Clause 40 _____ and 34
**Cancelling Date:** should the vessel not in all respects be ready to load (whether in bulk or in case berth designated by Charterers is not 35
accessible (not in berth) and ready before and per Clause No. 9 before 1700 hours on the _____ day of _____ 36
19 _____ the Charterers or Charterers' Agents shall at any time thereafter, but no later than one hour after notice is tendered 37
| on fixing | per Clause No. 9, have the option of cancelling this Charter Party. 38

**Notice of Expected** 4. Owners are to give Charterers at least 15 days | via cable/telex at both ends | 39
**Readiness:** exact quantity of cargo required to be loaded, subsequently Owners are to give Charterers 10 days and 5 days notice of ves- 40
sel's definite readiness to load. Such notices to be submitted by wire, telegram, radiotelex or writing. Should the vessel 41
be delayed for any reason whatsoever subsequent to the date of this Charter Party, prior to proceeding to loading port under 42
this Charter Party or thereafter, including delays in period or undergoing repairs, Owners to inform Charterers immediately 43
and at the same time give best evaluation of duration of delay and subsequently keep Charterers advised of any change in 44
vessel's expected arrival at loading port and discharging port. 45

**Preparation of** 5. At loading port(s), Owners are to tender vessel with holds properly swept, cleaned and dried, and free of resi- 46
**Holds for Loading:** due of all previous cargoes to inspector's satisfaction, and in all respects ready to receive the cargo. Where bulk cargo is to be 47
loaded, and prior to inspecting the vessel for loading, dunnage battens are to be removed, bilge boards, and limber boards are to 48
be in place and made tight against cargo seepage, and rose boxes are to be suitably covered against cargo seepage. Should 49
hand labor ultimately be required to discharge cargo from spaces so protected, cost of same to be for Owners' account, and 50
such discharge to be done at Owners' risk and on Owners' time. Where bagged cargo is to be loaded, cargo battens are to be 51
fitted prior to tendering the vessel for loading. 52

**Loading Rate:** 6. Cargo to be loaded, stowed and/or trimmed by spout only by Charterers' stevedores at Charterers' risk and ex- 53
| included | pense, at the average rate of 10,000 tons of metric _____ per workable hatch per weather working day of 24 running hours, 54
provided the vessel can load at that rate; Sundays, local and legal holidays excepted, even if used, whether in berth or not 55
time lost even on Saturdays or a day preceding any holiday until 1400 hrs on Monday or the day following any holiday 56
not to count as loading time, even if used, whether vessel is in berth or not, but notice tendered/accepted per Clause No. 9. 57

Dec 30 2004 12:31    International Materials I  610-520-1982    p.3

**Discharging Rate:**
[included]

7. Cargo to be discharged by Charterers' stevedores at Charterers' risk and expense, at the average rate of 58
12,000 ... tons of metric ... per weather working day of 24 running hours, provided the ves- 59
sel can discharge at that rate, Sundays, local and legal holidays excepted, even if used, whether in berth or not, time from 60
noon on Saturday or a day preceding any holiday until 8.00 a.m. on Monday or the day following any holiday not to count 61
as discharging time, even if used, whether vessel is in berth or not, but notice tendered/accepted as per Clause No. 9. 62

Laytime not-reversable 63

8. Charterers shall have the option of averaging laytime at loading and discharging ports. 63

**Time Commences:**
See Clause 50
NOR may be tendered
24 hours SHINC

9. Time at loading/discharging port to commence at ... 12 hours after ... following the day Master has ten- 64
dered in writing to the Charterers Agents during business hours, vessel's notice of readiness to load or discharge, vessel being 65
in all respects ready to receive/discharge cargo. Business hours are 0600 to 1700 on workdays and 0600 to 1200 on Satur- 66
days. Unless sooner commenced, in which case all time used to count. 67
In case the berth designated by Charterers or their Agents is occupied upon ship arrival inside port limits, notice can be tender- 68
ed on arrival during business hours, vessel being in all other respects ready to receive/discharge cargo. In case berth designa- 69
ted by Charterers or their Agents is occupied upon ship's arrival outside port limits, as near as she may safely get, and ship 70
is not permitted by Port Authorities to enter the port due to congestion, notice of readiness can be tendered on arrival during 71
business hours, vessel being in all other respects ready to receive/discharge cargo, but all time used by ship to proceed from 72
point where notice was presented to berth to be deducted from laytime. 73

**Demurrage and Despatch:**

10. Charterers are to pay demurrage at the rate of U.S.$ ... medium ... 25,000 ... [half L] ... 74
per day of 24 running hours or pro rata for any part thereof, for all time used in excess of laytime. Owners are to pay des- 75
patch money at half the demurrage rate per day of 24 running hours or pro rata thereof for laytime saved. 76

**Loading and Discharging Berth:**

11. The cargo is to be loaded and/or discharged at any wharf dock or place that Charterers or their agent may di- 77
rect, provided the vessel can lie always safely afloat, except that Charterers or their agent shall have the privilege of ordering the 78
vessel to load and/or discharge at any wharf, dock or place where it is customary for vessels of similar size to lie not always 79
afloat but safely aground. 80

**Privilege of Additional Berths:**

12. At loading and discharging ports Charterers shall have the option of ordering the vessel to more than one 81
berth, in which case shifting expenses shall be for [Owners] account, Time used in shifting shall count as laytime, unless the 82
shift is made during excepted time. 83

**Winch and Light Clause:**

13. Vessel to supply, at Vowk-ends, and at all times-free of charge to Charterers, winches, power and gear in good 84
working condition and full light for night work on deck and in the holds if required. Unless otherwise provided, the vessel 85
to supply a minimum of two winches and derricks both either forward or aft at each hatch. Winchmen from shore, if required 86
by the regulations or custom of the port, to be for Charterers' account. Charterers to have the privilege of working all 87
available cargo gear and all hatches simultaneously. 88

**Seaworthy Trim Clause:**

14. Where the port is loading and/or discharging port is used, the vessel to be so loaded and/or discharged as to leave 89
her in seaworthy trim for the passage between ports, but if this charter party be for a part cargo only, Charterers shall have 90
no liability in this respect where other cargo aboard render seaworthy trim between ports beyond Charterers' control. 91

**Deck Cargo:**

15. Charterers are to have the privilege of loading cargo on deck at their risk and expense, [and freight calculated on same] same to be loaded, 92
stowed and secured to Master's satisfaction. 93

**Dues, Wharfage And Taxes:**

16. At loading and discharging ports, all dues and/or wharfage and/or taxes on cargo to be for Charterers' account, 94
All dues and/or wharfage and/or taxes on vessel to be for Owners' account, even when the same are measured by the quantity 95
of cargo aboard ................................. 96
97
98

**Extra Insurance:**

17. Any extra insurance on cargo on account of vessel's age, flag, class, line or ownership to be for vessel's account. 99

**Dunnage:**
[notified Stevedores in writing within 24 hours]

18. Charterers are to provide all mats, and/or paper and/or wood for dunnage and any separations, also shifting 100
hold, if required. Owners are to allow the use of any such material as may be on board, if required by Charterers. It is further un- 101
derstood that Owners shall not dispose of any such material without first determining whether Charterers require the use of 102
same. On completion of the voyage, Charterers shall have the option of disposing of any dunnage purchased by them at Char- 103
terers risk and expense, and on Charterers' time, or leaving same on board the vessel. 104

**Stevedore Damage:**

19. When loading and/or discharging is effected by Charterers' stevedores, Charterers shall not be responsible for 105
repairing any stevedore damage unless the Master has obtained written acknowledgement of same from the stevedores, or 106
unless a joint survey has been made, attended by representatives of Owners and Charterers. 107

**Wireless Clause:**

20. The Master is to send a radiogram to Charterers or their agents giving vessel's expected time of arrival 72 hours 108
and again 24 hours before vessel is due at first loading and first discharging port. 109

**Lien Clause:**

21. Owners shall have a lien on the cargo for freight, deadfreight and demurrage. Charterers shall remain respon- 110
sible for deadfreight and demurrage incurred at port of loading. Charterers shall also remain responsible for freight and de- 111
murrage incurred at port of discharge, but only to such extent as Owners have been unable to obtain payment thereof by 112
exercising the lien on the cargo. 113

**Charterers's Bill of Lading:**
[CONSENT] [marked "Freight payable as per C/P"]

22. The Captain, Owners or agents to sign Bills of Lading at rate of freight as presented, without pre- 114
judice to this charter party, but not at less than the total chartered freight. 115

**General Average:**

23. General Average to be settled in New York London according to York/Antwerp Rules 1974, or any amendments thereto. 116

**Agency:**

24. At the port(s) of loading and the port(s) of discharge, Charterers are to have the privilege of appointing vessel's 117
agents; Owners paying customary fees. 118
See clause 48

**Deviation:**

25. The vessel shall have liberty to tow and/or assist vessels in all situations, and also to deviate for the purpose of 119
saving life and/or property. 120

Dec 30 2004 12:31    International Materials I   610-520-1882    p.4

      26. The Charterers to have the right to sublet part or all of this charter party, they to remain responsible to the  121
vessel Owner for due fulfillment of this charter party.  122

┌─────────────────────────────────────┐
│ In London, English Law to apply │
└─────────────────────────────────────┘

**Arbitration:**   27. All disputes arising out of this contract shall be arbitrated at New York in the following manner and be only  123
~~be to U.S. Law:~~   See clause 45  134
One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their decision or that of  125
any two of them shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the court.  126
The Arbitrators shall be commercial men, engaged in ocean cargo transportation. Such Arbitration is to be conducted in  127
accordance with the rules of the Society of Maritime Arbitrators, Inc.  128
For disputes where the total amount claimed by either party does not exceed U.S. $5,500 or amount as mutually agreed,  129
the Arbitration may be conducted in accordance with the Simplified Arbitration Procedure of the Society of Maritime  130
Arbitrators, Inc. if so desired by both parties.  131
In case a dispute arises which proves impossible to settle before decisions (of any nature) have to be made, both parties are  132
to take action or refrain from action at this time may be in order to minimize damages that can be reasonably foreseen.  133

**Description:**   28. Flag:          Year Built:    134
Deadweight:          Draft:    135
Gross Reg.:       See clause 39           136
Cubic feet bale/grain in holds:       Deeptanks:    137
Number holds/hatches:    138
Deck arrangement:    139
Engine and bridge placement:    140
Vessel's gear and where located:    141
Unless otherwise specified vessel's gear shall be capable at each hatch during loading and discharging to lift a minimum of  142
5 long tons and in union purchase a minimum of 3.5 long tons per lifting and to handle opening and closing of single line  143
grab buckets.  144

**Brokerage:**   29.  2.50%  percent brokerage on the gross amount of freight, deadfreight and demurrage earned is due  145
BADGUM  146
 147
In case of non-performance of this Charter Party, one-third of the brokerage on the estimated amount of freight and  148
deadfreight to be paid by Owners to the Brokers as indemnity for the latter's expense and work.  149

**Special Provisions:**   30. Clauses Nos. 31 to 38, inclusive, as set forth on the reverse side of this Charter Party, also typewritten  150
clauses Nos. 39 to 99 inclusive, as attached hereto, are hereby made part of this Charter Party.  151

Aidan O'Reilly
Chartering Manager
International Materials, Inc.

**31.    COMPUTATION OF LAYTIME**

It is understood that if the cargo cannot be delivered or loaded by reason of Act of God, Perils of the Harbor, War, Rebellion, Tumults, Civil Commotions, Insurrections, Political Disturbances, Government Intervention, Closure of Plant, Breakdown of Machinery, Epidemics, Quarantine, Riots, Strikes or Lock-outs or Work Stoppage of any class of workmen, Longshoremen or Stevedores or other persons essential to the working, carriage, delivery or shipment from point of origin to shipside, loading of the said cargo, whether partial or general, on accidents at the Plant, at Shippers' Works or Wharf, Landslides, Floods, Frost or Snow, Bad Weather, Intervention of Sanitary, Customs and/or Constituted Authorities, partial stoppages of Rivers, Canals or on Railways or any cause beyond the control of Charterers, affected voyage may be cancelled by Charterers without liability on the part of either party.

In case cargo cannot be loaded or discharged, or loading or discharging is interrupted by reason of any of more of the above causes, any time so lost shall not be computed as laytime, unless vessel is already on demurrage. The Charterers shall endeavor to keep vessel notified as far in advance as possible, of any such causes when they occur together with any information available to them of expected duration of same.

**32.    OWNERS RESPONSIBILITY CLAUSE**

Owners shall, before and at the beginning of the voyage, exercise due diligence to make the vessel seaworthy and properly manned, equipped and supplied, and to make the holds and all other parts of the vessel in which cargo is carried, fit and safe for its reception, carriage and preservation. Owners shall properly and carefully handle, carry, keep and care for the cargo. Owners elsewhere in this charter party it is provided that the loading, stowage and/or discharge of the vessel is to be at Charterers' risk and expense, Owners shall properly and carefully load, stow and discharge the cargo.

Neither Owners nor the vessel shall be liable for loss of or damage to the cargo arising or resulting from unseaworthiness, unless caused by want of due diligence on the part of Owners to make the vessel seaworthy, and to secure that the vessel is properly manned, equipped and supplied, and to make the holds and all other parts of the vessel in which cargo is carried, fit and safe for its reception, carriage and preservation; act, neglect or default of the master, mariner, pilot, or the servants of the Owners in the navigation or in the management of the vessel; fire, unless caused by the actual fault or privity of the Owners; perils, dangers and accidents of the sea or other navigable waters; act of God; act of war; act of public enemies, arrest or restraint of princes, rulers or people, or seizure under legal process; quarantine restrictions; act of omissions of Charterers or of the shippers or owners of the goods, their agents or representatives; strikes or lockouts or stoppage or restraint of labor from whatever cause, whether partial or general (provided, that nothing herein contained shall be construed to relieve Owners from responsibility for their own acts); riots and civil commotions; saving or attempting to save life or property at sea; wastage in bulk or weight or any other loss or damage arising from inherent defect, quality or vice of the goods; insufficiency of packaging; insufficiency or inadequacy of marks; latent defects not discoverable by due diligence; any other cause arising without the actual fault or privity of the Owners or without the fault of the agents or servants of the Owners. But the burden of proof shall be on the Owners or other person claiming the benefit of this exception to show that neither the actual fault or privity of the Owners nor the fault or neglect of the agents or servants of the Owners contributed to the loss or damage.

**33.    GENERAL ICE CLAUSE — Loading Port**

(a)    In the event of the loading port being inaccessible by reason of ice when vessel is ready to proceed from her last port or at any time during the voyage or on vessel's arrival or in case frost sets in after vessel's arrival, the Captain for fear of being frozen in is at liberty to leave without cargo, and this Charter shall be null and void.

(b)    If during loading the Captain, for fear of vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for Owners' benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter to be forwarded to destination at vessel's expense but against payment of freight, provided that no extra expense be thereby caused to the Receivers, freight being paid on quantity delivered (in proportion if lump sum), all other conditions as per Charter.

(c)    In case of more than one loading port, and if one or more of the ports are closed by ice, the Captain or Owners to be at liberty either to load the port cargo at the open port and fill up elsewhere for their own account as under Section (b) or to declare the Charter null and void unless Charterers agree to load full cargo at the open port.

(d)    This Ice Clause not to apply in the Spring.

**Discharging Port**

(a)    Should ice (except in the Spring) prevent vessel from reaching port of discharge, Receivers shall have the option of keeping vessel waiting until the reopening of navigation and paying demurrage, or of ordering the vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after Captain or Owners have given notice to Charterers of the impossibility of reaching port of destination.

(b)    If during discharging the Captain for fear of vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge.

(c)    On the delivery of the cargo at such port, all conditions of this charter party shall apply and vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

**34.    NEW JASON CLAUSE**

In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

**35.    BOTH TO BLAME COLLISION CLAUSE**

If the liability for any collision in which the vessel is involved while performing this bill of lading, falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Carrier.

The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

**36.    U.S.A. CLAUSE PARAMOUNT**

This bill of lading shall have effect subject to the provision of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any terms of this bill of lading be repugnant to said act to any extent, such terms shall be void to that extent but no further.

**37.    CANCELLATION OF SHIPPING WAR RISK CLAUSES**

1.    In case of loading to the port or any of the docked port and if the port of discharge be declared blockaded after bills of lading have been signed, or if the port to which the ship has been ordered to discharge either on signing bills of lading or thereafter be one to which the ship is or shall be prohibited from going by the Government of the Nation under whose flag the ship sails or by any other Government, the owner shall discharge the cargo at any other port covered by this Charter party as ordered by the Charterers (provided such other port is not blockaded or prohibited) or on above mentioned and shall be entitled to freight as if the ship had discharged cargo at the port of discharge to which she was originally ordered.

2.    The ship shall have the liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or otherwise howsoever given by the Government of the nation under whose flag the vessel sails or any department thereof, or any person acting or purporting to act with the authority of such Government or of any department thereof, or by any committee or person having, under the terms of the war risks insurance on the ship, the right to give such orders or directions and if by reason of and in compliance with any such orders or directions anything is done or not done, the same shall not be deemed a deviation, and delivery in accordance with such orders or directions shall be a fulfillment of the contract voyage and the freight shall be payable accordingly.

**38.    F. & I. BUNKERING CLAUSE**

The vessel in addition to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter and there take oil bunkers in any quantity in the discretion of owners even to the full capacity of fuel tanks, deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

## RIDER CLAUSES TO MV "TBN"
## CHARTER PARTY DATED 19TH OCTOBER 2004

### Clause 39 – Vessel's Description – all details 'about'
Basis San Juan Navigation TBN
-maximum 25 yrs
-vessel restrictions both ends shall be owner's responsibility.

### Clause 40 – Routing Panama Canal Blockage
All vessels are to be routed via the Panama Canal. However, in the event of a blockage of the Panama Canal it is agreed that the Owner and the Charterers shall discuss the circumstances and make best efforts to determine a mutually acceptable solution. Owners agree to take out Panama Canal Blocking & Trapping Insurance for which Charterers agree to pay USD 2500 per voyage.

### Clause 41 – Banking Details
Freight payable to Owners bank by telegraphic transfer:
Cowlitz DBA Bay Bank
10500 NE 8th Street,
Bellevue, Washington 98004
USA

ABA# 123 307 683
San Juan Navigation Corp.
900 Winslow Way East Suite 220
Bainbridge Island, Washington 98110
USA

### Clause 42 – Notice
Vessel to give seventy two (72), forty eight (48), and twenty four (24) hours definite notice of estimated time of arrival for loading to agents at loadport.

### Clause 43 – ISPS Bimco Clause
"From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this charterparty, the Owners shall procure that both the vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense of delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account.

### Clause 44 – Nomination/Laycan
Charterers shall give owners 30 days notice of a 7 day laycan . Maximum 1 shipment in each of first and fourth quarters. Tentative schedule without guarantee is:

First cargo: end March early April
Second cargo: mid may
Third cargo: mid July
Fourth cargo: mid September
Fifth optional cargo: end October

### RIDER CLAUSES TO MV "TBN"
### CHARTER PARTY DATED 19TH OCTOBER 2004

## Clause 45 – Bills of Lading
Bills of lading to be issued in Charterers office on behalf of Master and in conformance with Mate's receipt. Owners to approve Bills of Lading in writing before they are signed. Copies will be faxed to Owners prior to approval. Bills of lading CONGEN 1978 edition to be used.

## Clause 46 – LMAA Small Claims Clause
Notwithstanding anything contained in the Arbitration Clause 1 to the contrary, should neither the claim nor the counterclaim exceed U.S. $50,000, exclusive of interest on the sum claim, costs of the arbitration, and legal expenses, if any, it is hereby agreed the dispute is to be governed by the London Maritime Arbitrators Association Small Claims Procedure 1989.

## Clause 47 – No Deduction Clause
Charterer may not deduct, set-off or withhold from freight otherwise due any sums or claims which are not explicitly and specifically allowed by the terms of this Charter Party, including sums or claims alleged to be based upon any equitable right of set-off. In the event Charterers deduct, set-off or withhold from freight any sums or claims not explicitly and specifically allowed by the terms of this Charter Party, then, in addition to their other rights and remedies, Owners may immediately enforce their rights to the freight wrongfully deducted or set-off via a claim in arbitration, plus interest on the freight awarded as freight in any such arbitration, plus interest on the freight awarded at 12 per annum (unless the arbitrators award interest at a higher rate), and plus all costs and expenses associated with the award, including Owners attorneys' and arbitrator's fees and expenses.

## Clause 48 – Charterers Agents

Charterers agents at loadport:

CONCHAN
SERPAC AGENCY
LIMA, PERU
CONTACT: EDMUNDO GUZMAN
EMAIL: eguzman@serpacpac.com.pe
PHONE: 511-332-4466

## Clause 49 – Swell Clause
Laytime shall count 50% during which swell conditions require a stoppage of loading, unless already on demurrage in which case time to count fully. Should it be necessary to shift the vessel(s) to the roads then Charterers are to pay 50% of the shifting expenses (pilots/tugs/mooring/unmooring etc)

## Clause 50 – Loadport Laytime
At loadport NOR may be tendered 24 hrs SHINC. If NOR is tendered prior to 1630 hours then laytime shall commence 12 hours after NOR is tendered unless sooner commenced in which case actual time used to count. If NOR is tendered 1630 to 2400 hours, then laytime shall commence at 0900 hours the next day unless sooner commenced in which case actual time used to count.

## Clause 51 – Demurrage
Demurrage to be declared upon vessel nomination but maximum USD 25,000 pdpr/hdlts bends

2

## RIDER CLAUSES TO MV "TBN"
## CHARTER PARTY DATED 19TH OCTOBER 2004

### Clause 52 – VOYWAR 1993

(1) For the purpose of this Clause, the words:

(a) 'Owners' shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise how- soever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

(3) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

## RIDER CLAUSES TO MV "TBN"
## CHARTER PARTY DATED 19TH OCTOBER 2004

(4) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(5) The Vessel shall have liberty:-

(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

(b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(e) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;

(f) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

4



Exhibit B

Jun.13. 2003  4:22PM    PACIFIC RIM 206 780-1554                    No.8741   P. 1

WORKING COPY



# Time Charter

## GOVERNMENT FORM

*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946.

1  **This Charter Party**, made and concluded in *Seattle, Washington* ..........12th.......... day of .... *June* ...... 19 *2003*
2  Between *Santos Maritime, S.A.* ....................................................................................................................................
3  Owners of the good *Greek*............................. Steamship/Motorship *"GEORGETE E"* (full description of vessel as per Clause 58) at ......
4  of *20,276*........... tons gross register, and ... *12,429*........... tons net register, having, engines of .................. indicated horse power
5  and with hull, machinery and equipment in a thoroughly efficient state, and classed ...... *Bureau Veritas*..................................................
6  at .......................................... of about ... *40,903* ........... cubic meters/feet bale capacity, and about *34,667 metric tons*...tons of 2240 lbs.
7  deadweight capacity (cargo and bunkers, including *fresh* water and stores not exceeding *one-and one-half percent of ship's deadweight capacity,*
8  allowing a minimum of fifty tons) on a draft of *10.76 meters* feet................... inches on a .................. Summer Freeboard, inclusive of permanent bunkers,
9  which are of the capacity of about .................................................... tons of fuel, and capable of steaming, fully laden, under good weather
10  conditions about .................................. knots on a consumption of about .................................. tons of best Welsh coal - best grade fuel oil - best grade Diesel Oil,
11  now *expected ready ex drydock Piraeus June 12th.* ...................................................................................................................
12  .............................................. and *San Juan Navigation, L.L.C.* ................ Charterers of the City of *Bainbridge Island, Washington*
13  **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14  *about time charter period of about 11-13 months, plus or minus 15 days in Charterers' option, via safe port(s), safe berths, safe*
15  *anchorage(s), always afloat, always accessible, rotation on or off the customary route, always within Institute Warranty Limits*
16  *(See Clause 45) except not always afloat but safely aground in River Plate-Uruguay, Brazilian ports north of Vitoria, and*
17  *Buenaventura, Colombia* within below mentioned trading limits.
18  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
the fulfilment of this Charter Party.
Vessel to be placed at the disposal of the Charterers, at *on dropping last seapilot Piraeus any time day or night, Sundays and holidays* ...........
*included* ................................................................................................................................................................
in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as
the Charterers may direct. If such dock, wharf or place be not available time to count as otherwise provided for in clause No. 6. Vessel on her delivery to be
ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the service *(See Clause 31)* having water ballast, winches
and
donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same time
(and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying, lawful *harmless merchan-*
*dise, including petroleum or its products, in proper containers, lawful* cargo always in conformity with ship's strength excluding *See Clause*
*47*
(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,
all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between such port and/or ports in British North
America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or
Mexico, and/or South America, ....................................................................................................................... and/or Europe
and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between
October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,

as the Charterers or their Agents shall direct, on the following conditions:

1. That the Owners shall provide and pay for all provisions, *boatage for their own business,* wages and consular shipping and discharging fees of
the Crew; also *all consular fees pertaining to vessel's nationality and all non-compulsory garbage removal,* shall pay for the
insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her first and keep
the vessel in a thoroughly efficient state in hull, *holds,* machinery and equipment *with all certificates necessary to comply with requirements at*
*all port of call* for and during the service.

2. That whilst on hire the Charterers shall provide and pay for all the fuel and diesel except as otherwise agreed, Port Charges, *customary*
*Pilotage, boatage on Charterers' business,* Agencies, Commissions,
Consular Charges (except those pertaining to the Crew), *canal tolls, boatage, compulsory garbage removal, river tolls, towage, compulsory*
*watchment, except as necessitated by crew background or documentation* and all other usual expenses except those before stated, but when the
vessel puts into
a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
illness of the crew or on cargoes carried prior to delivery to be for Owners account. Fumigations ordered because of cargoes carried or ports visited
while vessel is employed under this
charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
of six months or more.

Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
for dunnage, they making good any damage thereto.

48    3.  ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
49  ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~ .................. ~~tons and not more than~~
50  .................. ~~tons and to be re-delivered with not less than~~ .................. ~~tons and not more than~~ .................. ~~tons. See Clause 39~~

51    4.  That the Charterers shall pay for the use and hire of the said Vessel at the rate of *US $7,500 per day or pro rata, including overtime; for*
52  *first 35 days, US $8,500 per day or pro rata, including overtime for balance of period. Redelivery ballast bonus of US $75,000*
53  *for redelivery Aden/Japan including Australia/New Zealand.* ~~United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and stores, on summer freeboard, per Calendar Month.~~ *Hire payable every 15 days in advance* commencing on and from the day and *time* of her delivery, as aforesaid, and at

54  and after the same rate for any part of a day month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) at (*See Clause 33*) ..................
56  *any time day or night, Sundays and Holidays included,* unless otherwise mutually agreed. Charterers are to give Owners not less than *10 days*
57  *approximate and 7/5/3/2/1 days definite*
58    5.  Payment of said hire to be made in ~~New York~~ *per Clause 54* in cash in United States Currency, *every 15 days* ~~semi-monthly~~ in advance, and for the last half month or

59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60  due, if so required by Owners, ~~unless bank guarantee or deposit is made by the Charterers,~~ otherwise failing the punctual and regular payment of the
61  *hire,* or bank guarantee, or on any *fundamental* breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from ~~1 a.m. on the working day~~ *the date the*
    *vessel has been placed at Charterers' disposal.*

63  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~
64  ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65  ~~Cash for vessel's ordinary disbursements at any port may be advanced as required by the~~ ~~Captain~~ *Master,* by the Charterers or their Agents, subject
66  ~~to 2 1/2%~~ commission and their advances shall in no way be responsible for the application
67  of such advances.

68    6.  That the cargo or cargoes be laden and/or discharged in any *safe* dock/ ~~or~~ at any wharf or place *or safe anchorage or safe place in port or*
    *elsewhere* that Charterers or their Agents may

69  direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessel to safely
70  lie aground.

71    7.  That the whole reach of the Vessel's Hold, Decks, and usual places of loading, (not more than she can reasonably stow and carry), also
72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers ~~no fee or accommodation allow, Charterers~~
74  ~~paying Owners~~ .................. ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~
75  ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~ *No passengers.*

76    8.  That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency; and Charterers are to load, stow, *lash, secure, tally, dunnage, undunnage, unsecure and trim, unlash and discharge the cargo* at their
79  expense under the supervision of the Captain, who is to sign Bills of Lading for
    cargo as presented, in conformity with Mate's and/or Tally Clerk's receipts.

80    9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82    10.  That the Charterers shall have permission to appoint a Supercargo, *who is to sign usual LOI for passengers* who shall accompany the vessel
    and see that voyages are prosecuted

83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84  rate of *US $15 $1.00 per day.* Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual ~~Tally~~
85  ~~Clerks, Stevedore's Foreman, also~~ Charterers to pay *lumpsum $1,250.00 per month or prorata for part of a month for communications,*
86  *victualling and entertainment,* paying at the ~~current rate per meal, per meal, for all such victualling.~~

86    11.  That the Charterers shall furnish the Captain from time to time with all requisite Instructions and Sailing Directions, in writing, and the Char-
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-
89  sumption of fuel, *as well as revolutions of main engine and velocity and direction of wind and sea, all in the English language.*

90    12.  That the Captain shall use diligence in caring for the ventilation of the cargo.
91    ~~13.~~  That the Charterers shall have the option of continuing this charter for a further period of *11-13 months +/- 15 days in Charterers' option,*
92  *hire to be increased by US $500.00 per day* .................. ~~to~~ ..................
93  on giving written notice thereof to the Owners or their Agents *by the end of the 10th month* ~~days previous to the expiration of the first-named term, or any~~
    ~~declared option.~~

94    14.  That if required by Charterers, time not to commence before *June 18, 2003* .................. .................. ~~and should vessel~~
95  not have given written notice of readiness on or before *June 18, 2003* .................. ~~but not later than 2400 hours 4 p.m.~~ Charterers or
96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. *Owners to keep Charterers closely*
    *advised of vessel's position/readiness at all times. See also Clause 30.*

97    15.  That in the event of the loss of time from deficiency *default and/or strike of officers and/or crew* or of men or stores, fire, breakdown or
98  damages to hull, machinery or equipment,
    grounding, detention by average accidents to ship or cargo, drydocking *(no drydocking except in case of emergency)* for the purpose of examination or
99  painting bottom, or by any other cause *whatsoever*
    preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100  defect in or breakdown of any part of her hull, machinery or equipment, the time, *until the vessel has returned to same or equivalent position* an

Jun.13. 2003  4:24PM   PACIFIC RIM 206 780-1554                No.8741   P. 3

100  tors, and the cost of any extra, *directly related and proven*, fuel consumed in consequence

101  thereof, and all extra *directly related and proven* expenses shall be deducted from the hire. *Bunkers consumed during off hire for whatever*

*reason shall be calculated at same prices as bunkers on delivery.*

102  16.  That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106  purpose of saving life and property.

107  17.  That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at ~~London~~ New York,

108  one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for

109  the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men *persons. See also Clause 72*

110  18.  That the Owners shall have a lien upon all cargoes, and all sub-freights *and sub-hires* for any amounts due under this Charter, including General

Aver-

111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113  might have priority over the title and interest of the owners in the vessel.

114  19.  That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115  Crews' proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~

116  York-Antwerp Rules 1974, *as amended 1990, or any subsequent modification thereto* 1924, at such port or place in the United States as may be

selected by the carrier, and as is unless not provided for by these

117  Rules, according to the laws and usages at the port of ~~London~~ New York. ~~In such adjustment disbursements in foreign currencies shall be exchanged into~~

118  ~~United States money at the rate prevailing on the date made and allowances for damage to cargo claimed in foreign currency shall be converted at~~

119  ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~

120  ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~

121  ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~

122  ~~required, be made by the goods, shippers, consignees or owner of the goods to the carrier before delivery. Such deposit shall, at the option of the~~

123  ~~carrier, be payable in United States money, and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~

124  ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balance, if any, shall be paid in~~

125  ~~United States money.~~

126  ~~In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever,~~

127  ~~whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

128  ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

129  ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~

130  ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

131  ~~ships belonged to strangers.~~

132  ~~Provisions as to General Average in accordance with the above~~ *New Jason Clause* are to be included in all bills of lading issued hereunder. *Hire not*

*to contribute to General Average.*

133  20.  *Diesel* Fuel used by the vessel while off hire, ~~also for cooking, condensing water, for grates and stoves to be agreed to as to quantity,~~ and the

134  cost of replacing same, to be allowed by Owners. *No deductions to be made for domestic fuel consumption.*

135  ~~21.  That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~

136  ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~

137  ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

138  

139  ...........................................................................................................................................................

140  22.  Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to *maximum capacity in*

*accordance with the description in Clause 88* these tons, also

141  providing ropes, falls, slings and blocks *as on board.* If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for

142  same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel ~~lantern and~~ oil power *and*

*electrical light sufficient for night work and in all holds simultaneously*

143  night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The

144  Charterers to have the use of any gear on board the vessel.

145  23.  Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;

146  ~~steamer to provide one winchman per hatch to work winches (by and night, as required. Charterers obligation to pay officers, engineers, winchmen,~~

147  ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rules stated in the ship's articles. If the rules of the~~

148  port, or labor union, prevent crew from driving winches, shore *Winchmen* cranesmen to be employed by and to be paid by Charterers and to be

always considered as Charterers' servants, *under Master's supervision and direction.* ~~In the event of a disabled winch or winches or~~

149  ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~

150  ~~thereby.~~

151  24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exceptions from liability contained

152  in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,

153  etc." in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the *Clauses enumerated in Clause*

*83 following clause, both*

154  of which are to be included in all bills of lading issued hereunder:

U. S. A. Clause Paramount

155  ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~

156  ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~

157  ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~

158  ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

159  Both to Blame Collision Clause

160  ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~

Jun.13. 2003  4:24PM    PACIFIC RIM 206 780-1554                    No.8741   P. 4

162  Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owner of the goods carried
163  hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164  or liability represents loss of or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
165  carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
166  owners as part of their claim against the carrying ship or carrier.

167      25.   The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169  port or to get out after having completed loading or discharging.

170      26.   Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171  navigation of the vessel, insurance, crew *acts of pilots and tugboats*, and all other matters, same as when trading for their own account.

172      27.   A commission of 2 1/2 per cent **1.25%** is payable by the Vessel and Owners to

173  *Pacific Rim Shipbrokers, Seattle, Washington and 1.25% to Seatrans, Piraeus* ...................................................................

174  on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175      28.   An address commission of 2 1/2 per cent payable to *San Juan Navigation, L.L.C.* on the hire earned and paid under this Charter.

*Attached Rider Clauses 29-90 inclusive together with New Jason Clause, New Both-to-Blame Collision and ConWartime 93 War Risk Clauses (Paragraphs A-G inclusive) to be considered part of this Charter party and all Bills of Lading shall be subject to these Clauses. U.S.A. Clause Paramount or Canadian Clause Paramount or any other similar enactment in the Country of shipment giving effect to the Hague Rules 1924, whenever applicable shall be deemed to be incorporated.*

*OWNERS:*                              *CHARTERERS:*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

Jun.13. 2008  4:25PM  PACIFIC RIM 206 780-1554          No.8741   P. 5

ADDED CLAUSES TO THE CHARTER PARTY DATED JUNE 13, 2008
SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

## Clause 29.  Confidentiality
All negotiations and eventual fixture when concluded to be kept strictly and private and confidential.

## Clause 30.  Notice of Delivery
Owners to give 15/10/7/5/3 days approximate and 2/1 days definite notice of delivery to San Juan Navigation by Fax (206) 780 6878 or Email sjn@sjnav.com and Pacific Rim Shipbrokers by Fax (206) 780 1554 or Email shipfix@pacrimfix.com and will keep the closely advised of any change in vessel's position before delivery.

## Clause 31.  Cleanliness on Delivery
On arrival at first port of loading vessel's holds to be thoroughly cleaned and free of rust scale in all respects ready to load Charterers' intended cargo as required by relevant inspectors. Should vessel fail such inspections vessel to be offhired from time of failing surveys until fully accepted and loading commenced. All costs directly resulting from such failure to be for Owner's account and may be deducted from hire.

In the event that any hold is not utilized at first loading port, the above provisions shall be extended to first port of loading of each cargo hold as applicable.

## Clause 32.  Onhire Survey
Joint on/off hire surveys to be held at first loadport and last discharge port respectively and cost of surveyor to be equally shared between Owners and Charterers. Owners to have right appoint Master as their own surveyor and to be released from any such costs related from any such costs related to such surveys. Any time actually lost at loading port to be for Owner's account but only to the extent that loading is actually prevented as a direct result of the onhire survey. Time for offhire survey to be for Charterers' account and vessel to remain on hire.

## Clause 33.  Redelivery

Redelivery Range:   Dropping last outbound seapilot, safe port Boston/Bahia range, including U.S. Gulf, Caribbean, North Coast South America, Skaw/Passero range, full Mediterranean including Black Sea excluding Sea of Azov, Chile/Vancouver BC range, Aden/Japan range.

Charterers to give 10/7/5/3/2/1 days redelivery notice.

## Clause 34.  Hold Cleaning
Charterers have the option to redeliver the vessel without cleaning holds in which case Charterers to compensate Owners US$3,500 lumpsum in lieu of hold cleaning for regular cargoes which excludes dunnage, bark and debris removal which to be removed by Charterers at their time and expense.   Charterers to compensate Owners US 6,000 lumpsum in lieu of hold cleaning for dirty cargoes or excluding dunnage/lashing disposal. Maximum six (6) dirty cargoes per year 1st and 2nd period declared.

SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

Intermediate hold cleaning if required by Charterers to be performed by vessel's crew, always including sweeping/washing down, Master to cooperate in dunnage and debris removal in accordance with local and international regulations. Hoses and pumps and other equipment, however, to be provided by and maintained by Owners. If vessel fails to pass holds inspection in order to load next cargo and holds cleaning team inspection in order to load next cargo and a holds cleaning team is required/needed for the cleaning of holds same to be at Charterers' time and expense.

In any event Owners are not to be responsible if vessel fails surveys due to lack of cleanliness, however maintenance of cargo holds to always be Owner's responsibility.

Charterers to pay Owners directly USD 600 per hold including provision of fresh water for intermediate hold cleaning except on redelivery or where other provisions are made in Cl. 47.

**Clause 35. Asian Gypsy Moth Clause**
In case vessel fails inspection due to infestation or contamination due to Asian Gypsy Moths, resulting from trading prior to delivery the time lost and expenses involved with cleaning to be for Owners' account and responsibility.

**Clause 36. Stevedore Damage**
Charterers are not to be responsible for stevedore or other damages to the vessel unless notified in writing by the Master at the time of occurrence or as soon as possible thereafter, but within 24 hours after occurrence except in case of hidden damage which to be notified as soon as possible after discovery but in any case not later than upon completion of loading at loadport(s) and discharging at discharge port(s). Where proper notices are given, the Master shall cooperate with Charterers and their agents and stevedores to obtain a written admission of responsibility from the party responsible for the damage and make every effort to ensure that the responsible party makes good the damages immediately. However Charterers have the option of redelivering the vessel without repairing stevedore damage unless such damage affects seaworthiness of the vessel or normal working or trading of the vessel. Owners agree that the damage may remain for occasional repair when the ship is to dock for Owners' account so that the Charterers pay the actual agreed cost of repair for stevedore damage but not the time used. Charterers have the option to be represented at the drydocking in such cases.

In case of stevedoring damage affecting seaworthiness of vessel, Charterers have to repair it before redelivery up to Class surveyor's satisfaction and vessel to remain on-hire during such repair period.

**Clause 37. Cargo Gear**
a)  Vessel's cargo gear and all other equipment including hold access arrangements shall comply with all regulations of the ports to which the vessel may trade. If stevedores, longshoremen or other workmen are not permitted to work due to failure of the vessel to comply with the aforementioned regulations, the Charterers may suspend hire for

SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

the time thereby lost, Owners to pay all extra expenses directly and resulting from such failure.

Vessel to work day and night and to provide lighting as on board for night work.

b)  In the event of breakdown or failure of vessel's cargo gear including lack of compliance as listed above, vessel to be offhired, in the event of partial failure vessel to be offhired pro-rata

For the purposes of pro-rata a crane which cannot service a workable hatch shall be excluded from the calculation of offhire to the number of cranes affected.

c)  Charterers shall have the option in the case of breakdown or failure of vessel's cargo gear to utilise shore cranes if available, but always after Owners' or Master's consent/agreement and all costs related to use of same to be for Owner's account, in this case vessel to remain onhire provided sufficient shore cranes available to replace vessel's gear, otherwise pro-rata to be applied as for (b) above.

### Clause 38.  Grab Discharge
Owners warrant that the vessel has clear holds and is suitable for grab discharge. Charterers have the privilege of using stevedore's equipment subject to tanktop strength of the vessel.

Vessel to be clear of any obstacles that may hinder loading, stowage and discharging. Any exposed cables, fittings or pipes to be entirely and properly protected by vessel.

### Clause 39.  Bunker Clause
Vessel to be delivered and redelivered with about same quantities estimated to be 460 mt IFO and 58mt MDO. Bunkers on redelivery about same as on delivery prices both ends US $175.00/mt IFO and US $270.00/mt for MDO.

Charterers have the right to bunker vessel for their account prior to delivery provided does not interfere with Owner's cargo operation and Owners to have similar right to bunker for their account prior to redelivery provided not interfering with Charterers' cargo operations.

### Clause 40.  Bunkering
At all bunkering ports including Panama Canal crew to connect and disconnect oil hoses to the vessel. Vessel to provide fittings to match local requirements, Should the vessel not be able to meet these requirements Charterers may suspend hire for the time so lost and Owners to pay all expenses resulting from such failure.

### Clause 41.  U.S. Bunkering
Owners warrant that the vessel is eligible for bunkering in the United States of America, its territories and possessions, and will continue to be eligible for the duration of the Charter period.

SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

**Clause 42.  Trading Exclusions:**
Vessel not to trade to any war or warlike/unsafe or dangerous zones and any zones/areas banned by the United Nations, as well as any ice-restricted areas.  Not limiting the above, vessel specifically not to trade to Cuba (unless licensed by the U.S. Government and no boycott applicable), Haiti, Norway, Sweden, Finland, Libya including Gulf of Sirte/Sidra, ports of former Yugoslavia including Montenegro and Serbia as long as U.N. Embargo is in force, but Slovenia is allowed, Bosnia-Herzegovina, Albania, to Cyprus, Israel, Georgia, Sea of Azov during the ice season, Mauritania, Sierra Leone, Liberia, Zaire, Sudan, Iraq (unless licensed by USA/U.N.), Laos, Cambodia, N. Korea, CIS Pacific, but the Island of Hokkaido allowed, Tasmania.  Vessel not to trade directly between Chinese and Taiwanese ports.  Charterers' option to break IWL and call zones where AWRP applicable provided they pay additional premiums which to be charged at the prevailing London market rate.  Same to be subject to Owner's approval which not to be unreasonably withheld.

**Clause 43.  Suez and Panama Canal Transit.**
Owners warrant that the vessel is fitted for transit of the Suez Canal and the Panama Canal and has valid certificates covering the transit of Suez Canal and Panama Canal.

**Clause 44.  Trading Warranty**
Owners warrant that the vessel has not traded Cuba for past 180 days prior to arrival at first U.S. Port nor North Korea since the purchase of the vessel and not traded Russian Far East in past 12 months.  Owners guarantee vessel is not blacklisted and has not called Israel/Libya/Turkish occupied Cyprus before and that the vessel and/or Owners (or any other vessel under the same ownership and/or management) are not blacklisted by the Arab Countries nor elsewhere within the agreed trading limits.

**Clause 45.  Institute Warranty Limits**
Charterers' option to break Institute Warranty Limits and Charterers to notify Owners of their intention to do so and pay Owners extra insurance premium as per voucher from owner's underwriters but not exceeding the amount which would have been charged if the vessel were covered with Lloyds of London.

**Clause 46.  Port Denial / Restriction of Trading**
In the event of the vessel being denied or restricted in the use of port (except as provided in Clause 50) and/or loading and/or discharging facilities or shore labor and/or tug or pilotage assistance because of the vessel's flag or ownership or management or the wages or conditions of employment of her officers and/or crew or of the officers and/or crew of any other vessel under the same ownership or management or any other vessel as aforesaid hire shall cease for the time thereby lost and Owners shall be responsible for and shall promptly reimburse Charterers all extra expenses which Charterers may incur in trying to solve the situation (including proceeding to an alternative port or ports).  If the vessel remains idle for thirty consecutive days because of any of the above-mentioned causes, Charterers shall have the right to cancel the balance of the charter without

SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

prejudice to any claim they may otherwise have on the Owners always provided no cargo on board.

## Clause 47. Cargo Exclusions

The vessel shall be employed in carrying lawful merchandise all cargoes to be carried as per IMO/IMDG regulations excluding all IMO/IMDG classified cargoes under categories 1-9 and any goods of a dangerous, injurious, flammable, self-combustible or corrosive nature, except those cargoes commonly carried in standard bulkcarriers, and in accordance with the requirements or recommendations of the competent authorities of the country of the vessel's registry and of ports of shipment and discharge and of any intermediate countries or ports through whose waters the vessel must pass. Without any prejudice to the generality of the foregoing, in addition the following are specifically excluded:- arms / acids / all dangerous hazardous inflammable corrosive injurious boycott cargoes / all kind of drugs / aluminium / ammonia / ammonium / ammonium nitrate / ammonium sulphate / ammunition / ammunition + war material of any kind / animal meal / asbestos / asbestos or asbestos products / asphalt /bitumen / bones / bone ash and bone meal / borax / calcined pyrites+ashes / calcium carbide / calcium fluoride+hypochloride+oxychloride / calcium hydrochlorates / calcium oxychloride / carbide / carbon black / caustic soda /charcoal + charcoal concentrates /chlorine / clay* / cocoa concentrates / copper carbide / copper precipitates / copra + copra cake / cotton and cotton waste /creosote+creosoted goods / creosoted goods / direct reduced iron+derivatives / explosives of any kind or nature including blasting caps, detonators, / TNT, and dynamite / ferosilicon and by products / ferrosilicon+ferrophosphorus of any kind / fishmeal allowed provided deoxydized / flour in bulk / fluorspar / galean / gasoline / granite / hides / hooves / hot briquetted iron / jute / lead calcines / lead ore residue / lead sulphide /lime limestone / liquid cargoes of any kind / livestock of any description /magnesia / magnetite / magnetite-taconite / manioc and manioc pellets /milled rice allowed but not as first cargo after delivery/ mobile houses / motor spirits / motor vehicles / naphtha / nefelin syenite / nitrate of soda / nuclear and radioactive materials or wastes of any kind / nuclear fuel+substances / oil expellers of any kind /oilcakes / palm kernels / pencil pitch / pesticides / petroleum and all its byproducts derivatives /pitch / pond coals / prefabricated houses / pyrites / pyritic ashes / quarry products / quebracho extract and shavings / quick lime resins / radio isotopes / resins /scrap, but scrap xmbt allowed with soft landing clause / seedcakes / sheepskins / silicomanganese except appendix c type allowed/ sludga / soda / soda ash allowed but not as first cargo after delivery/ sodium metabisulphite / sodium sulphate / sparto grass / spentoxide spirits / sponge iron / sulphate / sunflower seed expellers and cakes /sulphur */tar turpentine / tar+tar products / tobacco / turpentine / vanadium ore /zinc ashes+derivatives / zircon logs are allowed but not wet and/or exotic logs.  Notwithstanding anything stated above, Charterers are allowed to load: logs allowed as per vessel's loading manual with lashing materials and stanchions as on board

## Sulphur

Charterers will provide Owners with specifications of same to enable Owners to obtain approval for loading sulphur, understood vessel may not load any cargo classified as IMO appendix 5.1. Owners accept to load sulphur proved that Charterers will pay any costs

SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

that will make the vessel acceptable for class approval and provided that no limewash will be required. Additional water/chemicals necessary for cleaning to be provided and paid for by Charterers.

Concentrates
Understood concentrates acceptable provided loaded and stowed w/in IMO regulations and moisture content to be certified prior shipment. All cargoes loaded are to be labeled/loaded/stowed/shipped/discharged in accordance with IMO rules/regulations/recommendations and in compliance with the code of safe practice for solid bulk cargoes and to the master's satisfaction.

Fishmeal
Fishmeal if carried to be antioxidant treated and any particular fittings required by IMO or local regulations to be supplied by Charterers at their expense.

Clay
Clay may be carried provided all cost materials for painting as required to be for Charterers time and avct and to master's satisfaction, but under his supervision. All negotiations in this respect to be done only with the master and not with any other member of the crew.

Charterers allowed max 6 cargoes per year out of: cement in bulk, petcoke, pigiron, salt, scrap, sulphur (provided not classified IMO 5.1)

Clause 48. IMO
The Charterers are to provide the Master with any evidence he may reasonably require to show that the cargo is packed, labeled, loaded stowed, carried and discharged in accordance with IMO and/or IMDG regulations, requirements and recommendations, failing which the Master is entitled to refuse to load such cargo or, if already loaded, to unload it at Charterers risk, time and expense. In case local and/or National Authorities require special documentation for any cargoes covered by IMO codes, Charterers are to be responsible for obtaining same at their time expense.

Clause 49. Deck Cargo
Charterers have the option of loading cargo on deck and hatch covers at Shippers/Charterers risk and expense and vessel not to be responsible for any loss and/or damage howsoever caused. Vessel to carry full deck load, if required, in accordance with usual Marine practice and safety regulations and the deck load will be limited by vessel's stability and seaworthiness. All deck cargo is to be stowed, lashed and secured at Charterers' risk and expense to Master's satisfaction and in accordance with all the appropriate regulations. All bills of lading issued for cargo carried on deck are to state, "Carried on deck at Shipper's and/or Consignees risk and expense, carrier not responsible for any loss or damage."
Vessel's crew to assist with maintaining secure lashings during course of sea voyage.

Jun.13. 2003  4:27PM  CIPACIFIC RIM 206 790-1554  PARTY DATED JUNE 12 No. 0741   P. 11

SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

**Clause 50.  Option to Load Multiple Cargoes in Same Hold**
While Charterers have the option to load two or more cargoes in the same hold,
Charterers are to supply, erect, dismantle and dispose of any and all separations required,
at their risk and expense.

**Clause 51.  Padeyes and Stanchions**
Charterers to have the option of welding padeyes, brackets and sockets for wooden
stanchions at their own arrangement and expense under Master's supervision and
approval, but to be removed by Charterers at their time and expense if required by
Owners, to Master's and/or Class surveyor's satisfaction.

**Clause 52.  Charterers' Materials**
Any material supplied by Charterers to be receipted for and delivered back to Charterers
at their time and expense before redelivery of vessel.

**Clause 53.  Double Banking**
Charterers to have the right to load and/or discharge and/or any other purpose by
Charterers on double banking basis or by any other approved means available at safe
loading and/or safe discharging port subject always to Master's satisfaction and any
additional equipment/facilities such as fenders whenever, wherever considered necessary
by Master are to be supplied by Charterers at their time and expense.  If at any time
during operation, the Master considers it unsafe to continue due to adverse weather
conditions, etc., he may order the other vessel/barge(s) away from his vessel or to remove
his own vessel in order to avoid prejudicing the safety of the vessel(s).  Vessel always to
remain on-hire during lightening/topping up operations.  Any additional insurance
premium, if required by Underwriters, as well as officers/crew remuneration, to be for
Charterers account.

**Clause 54.  Hire Payment**
Hire to be paid to Owners bank as follows:

EFG EUROBANK ERGASIAS S.A.
8, OTHONOS STR.
105 57 ATHENS, GREECE
FAX: 3233366
A/C NO: IBAN GR66026 00290000 281200030741
FAVOR: SEABOUND MARITIME, INC.
SWIFT ADDRESS: EFGBGRAA
CORRESPONDING BANK: BANKERS TRUST NEW YORK
SWIFT NO: BKTRUS33

First hire plus value of bunkers on delivery to be paid to Owners' nominated bank
account within 3 banking days of vessel's delivery.

7 of 23

Jun.13. 2003  4:28PM CLPACIFIC RIM 206 780-1554 PARTY DATED JUNE 12, No.9741  P. 12
SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

**Clause 55. Deductions from Hire**
Charterers may deduct from the charter hire any amount disbursed for Owners' account.
Notwithstanding the contents of Clause 5, Charterers may deduct from the last sufficient
payment(s) of charter hire the estimated cost of bunkers remaining onboard on redelivery
and the estimated expenses incurred by Charterers for Owners' account, but maximum
US $1000/port for estimated Owners' items, notwithstanding that vouchers may not then
have reached Charterers for submission to Owners.  Finalization of accounts to be done
when Owners receive all original invoices/vouchers related to their own items at all ports
or vessel's call.

**Clause 56. Banking Errors**
Referring to Line 61:  Where there is any failure to make "punctual and regular payment"
including first hire payment and delivery bunker cost due to weekends or omission of
Charterers' employees, bankers or agents or otherwise for any reason where there is
absence of intention to fail to make payment as set out, Charterers shall be given three
banking days to rectify the failure, and where so rectified, the payment shall stand as
punctual and regular payment.

**Clause 57. G.M.T.**
For the purpose of computing hire payments, time for delivery / redelivery and all
applicable offhire periods to be based upon GMT.

**Clause 58. Off-hire**
In the event of the vessel deviating  (which expression includes putting back, or putting
into any port other than that to which she is bound under the instructions of Charterers)
for any cause or for any purpose which would result in payment of hire being suspended
under any provision of this charter, no hire shall in any case be payable from the
commencement of such deviation until the time when the vessel is again ready and in an
efficient state to resume her service from a position not less favorable to Charterers than
that at which the deviation commenced.  In the event of the vessel, for any cause or for
any purpose aforesaid, putting into any port other than the port for which she is bound on
the instructions of Charterers, the port charges, pilotage and other expenses at such port
shall be borne by Owners.

Charterers to have the option to add any off-hire period to the charter period.

In the event that vessel is offhire for drydocking or offhire for any other reason for which
vessel is responsible, for more than 10 days a joint bunker survey to be conducted to
establish bunker quantities before and after vessel going offhire cost of survey to be
shared equally between Owners and Charterers.

Bunkers consumed during offhire period to be for Owner's account and to be at prices as
per Charterers' invoiced prices basis Charterers' accounting method of first in/first out,
Owners have the option to replace bunkers consumed during offhire periods before vessel
goes back on hire which case any adjustment to also be at prices as listed above.
Charterers to provide Owners with copies of relevant bunker invoices in such cases.

Jun.13, 2008  4:28PM CR CPACIFIC RIM 206 760-1554  R PARTY DATED JUNE 12, 2008  No.8741    P. 13
SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

In the event that vessel is offhire for more than 20 consecutive days with the exception of regular scheduled drydocking periods, the Charterers have the option to cancel the balance of the Charter period and vessel will be considered to be redelivered at the commencement of such hire period, in such circumstances value of redelivery bunkers and other funds due to Charterers shall be immediately refunded by Owners.

**Clause 59.  Off-hire Due Sickness / Accident of Crew**
If, during the currency of this Charter, there is any deviation or any loss of time whatsoever caused by sickness of, or accident of crew or any person on board the vessel (other than supercargo traveling under Charterers' auspices), hire shall not be paid for the time so lost and the cost of extra bunkers consumed and any other extra expenses incurred shall be for Owners' account.

**Clause 60.  Bills of Lading**
The vessel to use Charterers' bills of lading or bills of lading approved by Charterers and/or sub Charterers. The terms of such bills of lading may not be contrary to the terms of this Charter Party.

During the period of this charter, Owners hereby authorize Charterers or their appointed agents to sign bills of lading for and on behalf of the Master if so required by Charterers who hereby indemnify vessel and Owners from all consequences arising from Charterers, Sub-Charterers or agents not incorporating remarks of Mate's receipts.

Charterers will make every effort to ensure that the original bills of lading are tendered to the Master upon vessel's arrival at the discharge port(s). Should for any reason the bills of lading be unavailable at that time the Master is to release the entire cargo to Charterers' order against presentation by Charterers or their agents of a letter of indemnity as per standard Owner's Protection and Indemnity Association wording, (See Appendix II) save that no bank countersignature shall be required. If required by Owners, Charterers confirm will collect full set of bills of lading from parties concerned and send the same to Owners as soon as possible after the vessel's discharging.

**Clause 61.  US Bill of Lading Identifier**
Charterers hereby warrant that they will take all necessary steps to comply in all respects with U.S. Customs requirements requiring a unique bill of lading identifier on all waybills, seaway bills, cargo manifests and bills of lading.  Charterers agree to hold Owners harmless and indemnify Owners in respect of any claims, fines, dues, or loss of whatsoever nature that may result directly or indirectly from any breach of this warranty or any failure by any party to comply with the customs requirements.

**Clause 62.  Cargo Liability / P and I Club**
Owners agree that liability for cargo claims, as between Owners and Charterers shall be apportioned as specified by the Interclub New York Produce Exchange Agreement 1996 including all amendments thereto. Charterers to enter vessel in P&I insurance for time Charterers' liability.  Owners to be informed as soon as possible in case of major claims.

Jun.13. 2003  4:29PM  PACIFIC RIM 206 780-1554  PARTY DATED JUNE 12  No. 8741   P. 14
SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

The Head Owners P&I Club is: London Steamship Owners Mutual. The Charterers P & I Club is: West of England

**Clause 63.  Insurance Cover**
Owners guarantee that vessel is covered on full terms for the full value of US$ 6,500,000.00 for Hull and Machinery Insurance value and that vessel is entered and shall so remain for duration of this charter on full condition.

**Clause 64.  Return of Insurance Premium**
Charterers to have the benefit of any return insurance premium received by Owners from Underwriters (as and when received) by reason of the vessel being in port for a minimum period of 30 days, provided vessel is on hire, and hire is being paid.

**Clause 65.  War Risk Insurance Claim.**
Basic Annual War Risk Insurance premium for worldwide trading to be for Owners account however any additional War Risk insurance premiums incurred by reason of vessels trading under this Charter Party (including those currently in force at the time fixing), also crew war bonus, to be for Charterers account.
Owners War Risk Underwriters are:  Hellenic War Risk. In the event of the vessel proceeding to an area subject to extra insurance, Owners undertake to investigate the Lloyds London market for the most competitive insurance quotation.  All premiums covering estimated time in war risk areas to be paid by the Charterers prior to vessels entry into those areas against original supporting vouchers.

**Clause 66.  Declaration of War**
In the event of a declaration of war between any two or more of the following - USA, Russia, China, United Kingdom and the vessel's flag state – then both parties have the right to cancel the balance of the Charter Party after completion discharge of the cargo currently on board.

**Clause 67.  Loss of Life**
The Charterers shall not be liable for loss of life or personal injury or arrest or seizure or loss or damage to the vessel or other objects arising from perils covered by the usual policies unless caused by the negligence of Charterers or their servants.

**Clause 68.  Valid Certificates**
a)  Owners to establish and maintain financial security for responsibility in respect of oil or other pollution damage to enable the vessel to lawfully enter, remain in and leave any port, place, territorial or contiguous waters of any country or state within permitted trading areas in performance of this c/p. Owners shall make all arrangements to satisfy such requirements at their expense.

b)  Charterer shall be under no responsibility for any and all consequences, including loss of time, of oil or other pollution damage and any failure or inability of the Owners to do as provided for above (a) and any loss of time incurred shall be offhire.

SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

### Clause 69. Vaccination/Sanitation

Officers and crew to comply with vaccination and sanitation requirements in all ports of call and corresponding certificates to be available on board. Any detention and/or fines resulting from not having these certificates on board to be for Owner's account and Charterers may deduct same from the hire.

### Clause 70. Self Trimming Warranty

Owners warrant that the vessel is a self trimming bulk carrier and fully complies with all the latest regulations re carriage of grain in bulk and her grain loading stability booklet has been prepared in accordance with the provisions of 'Chapter VI – Carriage of Grain – Of Solas 74' including any amendments. In addition an appendix is attached to the booklet in accordance with the provisions of IMO paper BC XIX/INF.4 dated July 13th 1978 "National Practice for dispensation for trimming ends on certain specially suitable ships"

Owners confirm that vessel is able to load a cargo of wheat and sail with two slack holds (minimum safety margin about 70-75 per cent) and always in accordance with vessels loading manual.

### Clause 71. Claim Against Vessel

Should the vessel be arrested during the currency of this Charter at the suit of any person having or purporting to have a claim against or any interest in the vessel, hire under this Charter shall not be payable in respect of any periods whilst the vessel remains under arrest or remains unemployed as a result of such arrest, and the Owners shall reimburse to the Charterers any expenditure which they may incur under this Charter in respect of any period during which by virtue of the operation of the clause no hire is payable. This clause shall not apply should the arrest be caused through any fault on part of Charterers (or related companies, affiliates and sub-Charterers).

### Clause 72. Small Claims Procedure 1989

Not withstanding anything to the contrary in this Charter Party, the parties agree that all Arbitrations where the amount in issue in the dispute(s) is less the U.S. dollars 50,000 shall be conducted according to the Small Claims Procedure 1989 (S.C.P.) of the London Maritime Arbitrators Association (as amended from time to time). If, after the Commencement of such a reference, it appears on reasonable grounds that the sums in issue in any dispute or disputes exceed U.S. dollars 50,000, either party shall be entitled to require in writing that the reference henceforth should proceed without regard to the S.C.P. provided that there is no prior agreement (whether in this Charter Party or not) to refer disputes to a sole arbitrator. Each party thereupon shall have seven days to appoint its arbitrator under arbitration provisions set out elsewhere in this Charter with the S.C.P. arbitrator sitting as umpire or third arbitrator.

### Clause 73. Weather Routing

Charterers may employ an independent weather routing company, during voyages specified by the Charterers. The Master to comply with the reporting procedure of the

SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

routing service, but it is understood that final routing is always at Master's discretion. For the purposes of this Charter Party "good weather conditions" are to be defined as weather conditions not exceeding Beaufort Force 4. Evidence of weather conditions to be taken from the vessel's deck log and independent weather routing company data. In the event of a consistent discrepancy between the deck logs and the independent weather routing company reports, the independent weather routing company data shall prevail.

### Clause 74. Reduced Speed
Charterers are allowed to perform the voyage(s) at reduced speed/consumption (without guarantee) subject to Master's and Chief Engineer's approval.

### Clause 75. Lay-up
The Charterers shall have the right to order the lay-up of the vessel at any time and for any period of time at a safe place and in the event of any such lay-up, the Owners shall promptly take steps to effect all the economies in operating costs, including insurance, which may be possible and give prompt credit to the Charterers in respect of all such economies. At the request of the Charterers, the Owners shall, at any time, furnish an estimate of the economies which would be possible in the event of laying up of the vessel, during the period of any lay up ordered by Charterers, hire, less such economies, shall still be payable. In the event of lay-up, the Charterers are to pay for all the expenses of such lay-up and subsequent reactivation of the vessel.

### Clause 76. Stowage Supervision
The Master shall supervise stowage of the cargo. At all times when vessel is working cargo an English speaking duty officer shall be available on deck to assist with and supervise cargo operations.

Vessel to furnish Charterers with stowage plan as well as tally sheets and other documents customarily used, all in the English language.

### Clause 77. Gangway Watchmen
Gangway watchmen for vessel to be for Owners account. Gangway watchmen for cargo and all compulsory shore gangway watchmen to be for Charterers account, unless required due to vessel's flag or crew.

### Clause 78. Contracting Services
Pilots, tugs and like services, although contracted for by Charterers or their agents, are understood to be servants of Owners and under the direction and responsibility of the Master.

### Clause 79. Smuggling
Owners to be responsible for any consequences owing to smuggling by vessel's officers and/or crew.

The Charterers expect that the Owners/Disponent Owners have guidelines on drug and alcohol abuse applicable to the vessel with the object that no seafarer will navigate a ship

SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

or operate its on-board equipment while impaired by drugs or alcohol and that no seafarer will have the use or possession of or the opportunity to sell or distribute or transport illicit or non-prescribed drugs aboard the vessel. Further, Charterers expect that the Owners/Disponent Owners exercise due diligence throughout the period of the Charter Party to ensure that such guidelines are complied with.

Charterers are signatories to the US Customs Service Sea Carriage Initiative Agreement concerning prevention of the carriage of illegal drugs on board vessels under their time charter. Owners agree to the terms of the Sea Carriage Initiative Agreement and undertake to instruct their servants, Master, officers and crew that they are to exert highest degree of care and diligence in complying with the terms of the agreement.

**Clause 80.  Drydocking Clause.**
Owners to give 3 months notice of intended drydocking with intended region.

Charterers to undertake to position the vessel for drydocking within the intended region provided does not unreasonable restrict vessel's trading. Costs of ballasting the vessel from discharge port within the region to drydock and reposition the vessel to a point in Charterers' option equidistant from the discharging port to be for Owner's account.

**Clause 81.  Crew Assistance**
Master's/Crew's Assistance.
With reference to Clause 8 of this Charter Party "customary assistance" shall mean all types of work which the Master and the crew would normally do when the ship is trading for the Owners' account such as, but not limited to:

1. Opening and/or closing of hatches in preparation of loading and/or discharging operations.
2. Assistance during docking and undocking, shifting, hauling/warping alongside wharf and bunkering operations.
3. Shaping up hatches as much as possible, weather permitting, prior to arrival at loading and/or discharge port and/or docks and/or places so that loading and/or discharging operations can commence immediately.
4. Supervision during loading and discharging.

Vessel to work day and night without Charterers special request.

**Clause 82.  Additional Clauses**
Conwartime 1993, New Both-to-Blame Collision Clause, New Jason Clause, ISM Clause, as attached, to be considered fully incorporated in this Charter Party.

**Clause 83.**
P and I Club Letter of Indemnity form for discharge of cargo without presentation of Original Bill of Lading, as per Appendix II attached.

Jan.13. 2008  4:30PM  CL PACIFIC RIM 206 780-1554 PARTY DATED JUNE 12, No.8741    P. 18

SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

**Clause 84.  Liability Insurance Clause**
The Charterers shall not be responsible for loss of life nor personal injury nor arrest or
seizure or loss or damage to the vessel, her cargo and/or other objects arising from perils
insured against by customary policies of insurance.

**Clause 85.  Magnets or Other Lifting Devices**
Charterers are allowed to fit vessel's cranes with grabs and/or magnets for loading and/or
discharging and vessel to supply sufficient power to operate all cranes simultaneously.

**Clause 86.  Stevedoring Machines**
Charterers to have the option to use bulldozers in vessel's holds, provided not exceeding
the tank top strength.

If required, vessel to lift onboard, shift from hold to hold and discharge the bulldozers by
use of vessel's gear.

**Clause 87.  Cement Holes**
Vessel shall be equipped with one permanent cement hole (700 mm diameter) on each
hatch center and 4 permanent grain holes (400mm diameter) on each hatch.

If cement holes are not available or not in the right positions, Charterers have the option
to cut permanent or temporary cement holes in vessel's hatch covers in connection with
loading cement and/or cement clinker and re-weld same after completion of loading.  The
cutting and re-welding to be done to class and Master satisfaction in Charterers time and
expense, risk and responsibility.

Cutting/rewelding not necessary if permanent cement holes installed.

**Clause 88.  Vessel's Description**
As per Appendix (I) attached.

**Clause 89.  Owner's LOI Wording**
As per Appendix (II) attached.

**Clause 90.  Grabs Clause**
Charterers have the option to use vessel's grabs provided that: checking, repair,
conditioning, maintenance, parts, labor and responsibility to make them operational to be
in Charterers' time and responsibility to make them operational to be in Charterers' time
and at Charterers' expense.  Charterers may negotiate directly with Owners/Master to
provide maintenance of the grabs.

Any time lost in grabs poor performance hoist speed if any, or any consequencial delay
that may occur, Owners may not be responsible whatsoever and the vessel will not be
placed off-hire.

SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

If the Master advises Charterers that he has on board competent operators for crane/grab operation, then Charterers to pay Owners the amount of USD .25/ton of cargo. If not, Charterers in coordination with Master can use stevedores at Charterers' expense, who will act under Master's supervision. If not, Charterers in coordination with the Owners/ Master can use stevedores at Charterers risk/expense, who will act under Master's supervision.

SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

## CONWARTIME 1993

1. For the purpose of this clause, the words:

    (a) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the vessel, and the Master; and

    (b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

2. The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to war risks. Should the vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

3. The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

4. (a) The Owners may effect war risks insurance in respect of the hull and machinery of the vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity risks), and the premiums and/or calls therefor shall be for their account.

    (u) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional

Jun.13. 2003  4:31PM CL.PACIFIC RIM 206 780-1554 PARTY DATED JUNE 12, No.:8741   P. 21
SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

premiums because of war risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

5.  If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6.  The vessel shall have liberty:

(a)  to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(b)  to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance; (c)  to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(c)  to divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;

(d)  to divert and call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

7.  If in accordance with their rights under the foregoing provisions of this clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the

17 of 23

SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

8. If in compliance with any of the provisions of sub-clauses (2) to (7) of this clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter Party.

## NEW BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the Servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier."

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the

carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery.

SEATTLE, WASHINGTON

"GEORGETE K"

SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

## ISM CLAUSE

It shall be an express condition of this Charter Party, that, from the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) and all documents associated with and/or comprising the Safety Management System (SMS) and/or the Safety Management Manual (SMM) as referred to in the ISM Code.

Non-compliance with the requirements of the Code shall constitute a repudiatory breach of contract. Without prejudice to the rights Charterers might have in the event of such breach, vessel will be offhire for the period of such non-compliance.

Jun.13. 2003  4:32PM  PAC CIFIC RIM 206 780-1594  PARTY DATED JUNE 12  No.8741  P. 24

SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

APPENDIX I
'VESSEL NAME"
TIME CHARTER DESCRIPTION

NAME : "GEORGETE K." - EX STAR CASTOR
OWNERS : SANTOS MARITIME S.A
NATIONALITY : GREEK FLAG, NO.10241
PORT OF REGISTRY : PIRAEUS
CALL LETTERS : SYLW
BUILDING YEAR : JULY/1984
VESSEL'S TYPE : BC
CLASSED BY : BUREAU VERITAS (+I3/3E, BC, ESP, DEEP
SEA, AUT-MS)
GROSS R.T. : 20276
NET R.T. : 12429
PANAMA GRT/NRT : 21376 / 17721
SUEZ GRT/NRT : 20608 / 18178
SUMMER DW DRAFT : 34607 MT 10,76 M
WINTER DW DRAFT : 33671 MT 10,53 M
TROPICAL DW DRAFT : 35527 MT 11,23 M
VESSEL IS BUILT AS A LOGGER, HWAS THE PERMANENT STANCHIONS ON
BOARD BUT
NO LASHING MATERIALS OR REMOVABLE STANCHIONS WHATSOEVER.

ENGINE CONSUMPTION
-------------------

TYPE : MITSUBISHI SULZER 4RTA58
MRC 7.680 PS AT 123.0 RPM
NRC 6.910 PS AT 119.0 RPM
SPEED : ABT 13 KNOTS
CONSUMPTION AT SEA : IFO 22 MT + 0,9 MT MDO ABT
AT PORT IDLE : IFO 0,7 MT + 0,9 MT MDO ABT
AT PORT CRANES WORKING : IFO 1,4 MT + 1,8 MT MDO ABT
IFO TYPE : BRITISH STANDARD IFO 180 CST RME 25 AT 15 DEGREES C
MDO TYPE : MARINE DIESEL OIL OR MARINE GAS OIL
IFO FULL CAPACITY : 1635 CBM
MDO FULL CAPACITY : 143 CBM
FULL F. WATER CAP. : 341 CBM
FULL BALLAST WATER CAP. : 11230 CBM
EVAPORATOR DAILY PRODUCTION : 20 MT
MAX CONSTANT EXCL FW, TPC : 200 T / 41.9MT/CM
MAX CONSTANT INCL FW : 400 MT
HOLDS CAPACITY
-------------------

PACIFIC RIM 206 780-1554 PARTY DATED JUNE 12
SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

NR 1 248,527/232,738
NR 2 316,342/297,819
NR 3 317,405/298,013
NR 4 317,405/298,013
NR 5 311,610/296,717cft

PRINCIPAL DIMENSIONS
------------------------
LENGTH O.A. : 176,0 M
LENGTH B. P. : 168,0 M
BREADTH MLD : 27,0 M
DEPTH MLD : 15,23 M
CARGO CAPACITY
------------------------
HOLDS GRAIN : 42794,9 CBM or 1,511,289 CFT
HOLDS BALE : 40303 CBM or 1,423,287 CFT

VARIOUS PARTICULARS
------------------------
HOLDS/HATCHES : 5/5
WINCHES/DERRICKS : 4 CRANES ea 25 TS MITSUBISHI EL - HYDRAULIC
DRIVEN SINGLE JIB WIRE
WORKING RADIUS : MIN 4,0 MTRS - MAX 22,0 MTRS
SLEWING/HOISTING SPEED: 0,8 RPM - 18,5/37/62 M/MIN
MAX OUTREACH OF CRANES: 22 MTR x 25 T
4 GRABS EA 8 CBM ELECTRO-HYDRAULIC
TYPE OF HATCH COVERS : FOLDING TYPE
VENTILATION : NATURAL
FIRE EXTING : $CO_2$ FITTED
GRAIN FITTED : YES
PANAMA FITTED : YES
FLOORING : STEEL
PADEYES FITTED : YES
STANCHIONS : YES
BULWARKS : YES
SIZE OF HATCHES
------------------------
1) 12,8 X 12,8
2) 12,8 X 19,2
3) 12,8 X 19,2
4) 12,8 X 19,2
5) 12,8 X 19,2m
HOLDS/TANK TOP DIMENSIONS
------------------------
H/1 5,3 x 25,0 x 18,8 M
H/2 18,8 x 26,2 x 19,3 M

SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

H/3 19,3 x 26,0 M
H/4 19,3 x 26,0 M
H/5 19,3 x 26,3 x 11,0 M
MAX PERMISSIBLE LOADINGS
--------------------------
TANK TOP HOLDS: H/1 - 11,6 MT/SQM
H/2 & 3 - 12,5 MT/SQM
H/4 - 12,7 MT/SQM
H/5 - 13,1 MT/SQM
WEATHER DECK : 3,85 MT/SQ
HATCH COVERS - 2,75 MT/SQ
ALL DETS WOG

SEATTLE, WASHINGTON
"GEORGETE K"
SANTOS MARITIME, S.A./SAN JUAN NAVIGATION, LLC

## APPENDIX II

Owners P and I Club Letter of Indemnity wording for discharge of cargo without presentation of Original Bill of Lading, as follows: